STATE OF CONNECTICUT *v.* BOOKER T. TORRENCE
(2699)

DANNEHY, C.P.J., TESTO and BORDEN, Js.

Argued January 10—decision released May 15, 1984

---

[4] We need not consider the defendants' second claim of error since the variance is a sufficient cause to remand the case.

*Jon C. Blue,* for the appellant (defendant).

*Katherine J. Lambert,* deputy assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *John M. Massameno,* assistant state's attorney, for the appellee (state).

BORDEN, J. The defendant appealed[1] from his conviction, in a single trial, of the following crimes: two counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2); one count of possession of a sawed-off shotgun in violation of General Statutes § 53a-211; one count of assault in the third degree in violation of General Statutes § 53a-61; one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3); and one count of kidnapping in the second degree in violation of General Statutes § 53a-94.[2] The first two robbery convictions and the

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c).

[2] In addition, the jury returned a guilty verdict on a charge of refusal to comply with identification requests in violation of General Statutes § 29-17, but the court suspended judgment on that count. Thus, there is no judgment of conviction of that offense. *State* v. *Moore,* 158 Conn. 461, 262 A.2d 166 (1969).

conviction for possession of a sawed-off shotgun arise from an armed robbery at a package store in Middletown at 1:20 p.m. on March 1, 1978. The third robbery conviction, the conviction of assault and the conviction of kidnapping arise from an assault on and the robbery and kidnapping of a victim at his home in Middletown at about 8:15 p.m. of that same day.

The first set of convictions involves evidence from which the jury could have found the following facts. At about 1:20 p.m. on March 1, 1978, the defendant, armed with a sawed-off shotgun, with two accomplices robbed two victims at a package store in Middletown. This robbery was immediately followed by an automobile chase of the defendant and his accomplices by the police. This chase was interrupted by the following confrontation. The defendant had stopped his car due to a collision. A police officer had left his cruiser and was walking toward the defendant's car with his gun drawn. The defendant then drove his car past the officer, who jumped from its path, fired at the defendant's fleeing car and resumed the chase in his cruiser.[3] A few minutes later the police found the car abandoned nearby, with the shotgun and some of the money from the robbery. The accomplices were discovered almost immediately, both within one quarter of a mile from the abandoned car.[4]

The second set of convictions involves evidence from which the jury could have found the following facts. The victim, 93 years old, lived in Middletown within three quarters of a mile from where the defendant and his accomplices abandoned their car. At about 8:15 p.m. on that same day, the victim went to the cellar of his home, where the defendant, who had broken in, was hiding. The defendant hit the victim on the head with

---

[3] The defendant was also charged with and acquitted of the crime of attempting to assault a peace officer arising out of this confrontation.

[4] The accomplices were tried separately from the defendant.

a hammer; took his wallet; tied his legs with ropes; hit him again repeatedly on the head with the hammer; placed a chopping block on his chest, cracking three of his ribs; threw kerosene and oil into his eyes; pulled the victim, still tied at his legs, into a cold storage room and shut the door; and went upstairs, where he took more cash and some rings of the victim. The victim managed to untie himself and leave the cellar. When he went outside to summon help, the defendant was there and hit the victim again on his head with the hammer. The defendant left the victim in the snow and went back into the house. The victim crawled back into the cellar and eventually the defendant left the house. At about 10 p.m. the defendant was hitchhiking out of town about one quarter of a mile from the victim's house when he was picked up by a police officer. The defendant was in possession of the victim's social security card.

The defendant's principal defense at the trial was lack of mental capacity, or insanity, under General Statutes § 53a-13.[5] Two experts testified on his behalf. Lee David Brauer, a psychiatrist, testified to the effect that the defendant was borderline psychotic, paranoid and delusional, and that his mental illness rendered him unable to conform his conduct to the law. David Fitzgibbons, a psychologist, testified to the effect that the defendant was chronic paranoid schizophrenic, and that the confrontation with the police officer caused him to lose control of himself. In rebuttal the state offered Mehadin Arefeh, a psychiatrist, who testified to the effect that

---

[5] General Statutes (Rev. to 1977) § 53a-13 then provided as follows: "In any prosecution for an offense, it shall be a defense that the defendant, at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental disease or defect do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

the defendant was not mentally ill and could conform his conduct to the requirements of the law.

The defendant's appeal raises three grounds. We find no error.

## I

The defendant's principal claim is that the court erred in its charge to the jury on the issue of mental capacity under General Statutes (Rev. to 1977) § 53a-13. The charge is quoted in full in the footnote, with the challenged portion in italics.[6]

---

[6] "Insanity is not a good defense for any act amounting to a crime if it is committed by a sane person. The law, on the other hand, absolves from responsibility a man whose mental condition does not reach the legal standards of sanity.

"I will now read the standard by which our law has adopted and defines as the standard of sanity. You will note some of the phrases which have been discussed in the courtroom in the development of the trial are absent from the definition. For instance, the words psychopathic, sociopathic, psychiatry and psychology do not appear in the definition that I am about to give you, nor do the terms personality disorder or emotional instability appear in the definition because our statute defines the defense of insanity as follows, 'In any prosecution for an offense, it shall be a defense that the defendant, at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental disease or defect do not include an abnormality manifested only by a repeated criminal or otherwise antisocial conduct.'

"Once again, I will read that section 53a-13, which is entitled, Insanity as a defense. 'In any prosecution for an offense, it shall be a defense that the defendant, at the time of the proscribed conduct, as a result of mental disease or defect lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. As used in this section, the terms mental disease or defect do not include an abnormality manifested only by a repeated criminal or otherwise antisocial conduct.'

"The legal standard which I just gave you may or may not be in accord with some medical views. You are the ultimate arbiters of this question and so in dealing with the medical testimony, you will weigh such testimony with a careful regard as to all the elements of the testimony, the history

Because the defendant neither filed a request to charge nor took an exception to the charge as given, in order to review this claim under the *Evans* bypass doctrine we must first determine whether the charge raises a question of constitutional dimension and, if so, whether the claim has merit. *State* v. *Kurvin,* 186 Conn. 555, 557, 442 A.2d 1327 (1982); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). "The state was obli-

---

received by the doctors, the background received by the doctors, what they heard, what they talked about the defendant and all the rest of it.

*"The definition of insanity, or lack of capacity, would include a mind which is either so naturally weak or so impaired by disease or otherwise as to make its possessor incapable of distinguishing right from wrong. It would not include a mind which, while weak or incapable in some measure, is still sound enough to make an essential choice in the course of conduct.*

"A man of merely dull or diminished intellect would not necessarily be irresponsible within the meaning of the law. The law stresses that the defendant must lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Substantial is defined as being considerable or large, not minor or trivial.

"We have had here testimony of medical experts who with respect to the medical and emotional capacities of Mr. Torrence, and here again, the weight which you give to these experts' opinions, as with other witnesses, is for you to determine. The testimony of the doctors was based upon medical examination, largely upon questions and answers by the accused, also from reading some of the evidence of the case and history. If you find that the doctor bases his opinion wholly or partially on statements made to him by the accused, then you may consider whether the statements from the accused were to be believed or not.

"As I told you before, all witnesses should be scrutinized as to their motive and what they may feel about the outcome of the case and any desires they might have. In short, you are not to let the experts decide the case for you. You are the deciders of the case. The experts are merely giving an opinion to you to help you decide. It is for you to determine what weight, if any, you will give to their testimony. You are the ultimate and final judges. You must resolve conflicting opinions between the doctors, using all your knowledge of human kind and human experience.

"Of course, the sanity or insanity, that is important here, is the condition of the defendant at the time the acts were done, namely, March 1, 1978. Acts before or after that may have some bearing upon that, but it is focusing upon that date that you must focus in deciding what his mental capacity was at that particular time.

"Once again, the State, as in all criminal cases and in all aspects of a criminal trial, has the burden of proof beyond a reasonable doubt."

gated to prove every essential element of the crime[s] including, upon challenge, the defendant's sanity." *State* v. *Ontra,* 178 Conn. 480, 486, 423 A.2d 134 (1979). The charge improperly injected into this issue the element of the defendant's capacity to distinguish right from wrong. See footnote 2, supra; see also *State* v. *Toste,* 178 Conn. 626, 424 A.2d 293 (1979). The state's evidence of the defendant's commission of the crimes was not contradicted, and the defendant introduced without limitation, through his psychiatric witnesses, evidence of his presence at the package store and in the elderly victim's cellar. Thus, as both the state and the defendant agree, the only real issue in the case was the defendant's mental capacity. Under these circumstances, we conclude that the injection of the right-wrong test into the essential element of the defendant's mental capacity was of constitutional dimension. We therefore consider the merits of the defendant's constitutional claim.

It is clear that the inclusion in the charge of the challenged language, which involved the abandoned *M'Naghten* test, was error. *State* v. *Jones,* 193 Conn. 70, 85, 475 A.2d 1087 (1984); *State* v. *McCall,* 187 Conn. 73, 86–87, 444 A.2d 896 (1982); *State* v. *Toste,* supra, 632–33. This is particularly true in view of No. 336 of the 1967 Public Acts, which, as General Statutes (Rev. to 1968) § 54-82a, was the statutory predecessor of General Statutes § 53a-13. Section 2 of that public act provided that "[t]ests of insanity previously used in criminal cases are hereby abolished."

This does not end our inquiry. We must still determine whether the error was reversible. "An error of constitutional dimension in the instructions in a criminal case is reversible error when it is reasonably possible that the jury were misled by the instructions." *State* v. *Kurvin,* supra, 572 *(Speziale, C. J.,* dissenting); see also the majority opinion in *State* v. *Kurvin,* supra,

558–66. "The scope of appellate review of [a claim under the *Evans* exception] is, however, limited by virtue of its constitutional origin." *State* v. *McCalpine,* 190 Conn. 822, 828, 463 A.2d 545 (1983). That scope is confined to ascertaining not "whether the ruling or instruction was undesirable, erroneous, or even universally condemned but rather whether when reviewed in the context of the entire trial it violated" the defendant's fundamental rights under the fourteenth amendment to the United States constitution or article first, § 8 of the Connecticut constitution. *State* v. *Kurvin,* supra, 565. "Due process seeks to assure a defendant a fair trial, not a perfect one." Id. Thus, the *Evans* bypass is not aimed at errors of law which, by traditional analysis, would merely be deemed harmful; rather it "is designed to protect fundamental constitutional rights . . . ." Id., 566.

*State* v. *Kurvin,* supra, makes clear that, in reviewing such a claim, we must balance "two concepts which if not mutually exclusive at least appear to lead us in opposite directions." Id., 561. The first is that a claimed error involving an essential element of the crime "must be examined . . . in a constitutional penumbra." Id. This involves an inquiry into whether the error had substantial influence on the result. Id., 562. The second is that, "absent real rather than abstract constitutional violations criminal prosecutions should, at some point, be laid to rest." Id., 563. This involves several related notions: that rarely will an improper instruction, which was not so obviously prejudicial that the defendant himself disregarded it, justify reversal of a criminal conviction; that requiring such claims of error to be made at trial has the salutary purposes of permitting their correction before it is too late, and of avoiding subjecting an accused to needless multiple prosecutions, which is not in the public interest and which contributes to the economic waste and court congestion caused by

unnecessary trials; and that such a requirement discourages trial by ambuscade and avoids transforming criminal trials into games of chance. Id., 563–66.

Furthermore, and most significant for this case, *Kurvin* makes clear that, in deciding whether an error of constitutional dimension in a charge is reversible, the charge "is not to be examined in a vacuum. Rather, it is to be viewed in the context of the factual issues raised at the trial." Id., 558. We must " 'view the charge itself as part of the whole trial.' *United States* v. *Park,* 421 U.S. 658, 674, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975)." *State* v. *Kurvin,* supra, 563. "Whether a charge is possibly misleading depends on the substance rather than the form of what is said." Id., 565. We must examine the issue or issues before the jury, including what was undisputed, and examine the charge "in view of the factual posture of the case." Id., 569.

Applying these principles to this charge, we conclude that the error was not reversible because, in view of the factual posture of the case, it is not reasonably possible that the jury was misled.

The defendant points to two sentences in the charge which he claims misled the jury. The first is as follows: "The definition of insanity, or lack of capacity, would include a mind which is either so naturally weak or so impaired by disease or otherwise as to make its possessor incapable of distinguishing right from wrong." See footnote 6, supra. This was a shortened version of our prior law, derived from *M'Naghten's Case,* 8 Eng. Rep. 718 (1843). See *State* v. *Toste,* supra, 630. This aspect of the prior law stated the cognitive, as opposed to the volitional, element of the insanity defense. The cognitive element of the prior insanity defense was replaced by that part of General Statutes (Rev. to 1977) § 53a-13 which asks whether the defendant " 'lacked substantial capacity . . . to appreciate the wrongful-

ness of his conduct . . . .' " Id., 632. Thus, while both the prior case law and the current statutory law involve an inquiry into the defendant's perception of wrongfulness, the statutory test is less stringent. Id. In this case, however, the cognitive element of the insanity defense was not in issue in any way. The testimony of the defendant's experts, Brauer and Fitzgibbons, which consumes 233 pages of transcript, is bereft of any inkling that he did not appreciate the wrongfulness of his conduct. Indeed, the entire thrust of their testimony was that he was mentally ill and that he could not conform his conduct to the requirements of law. Thus, their evidence led only to an inquiry into the volitional element of the defense. The testimony of the state's expert, Arafeh, which consumed 24 pages of transcript, was almost entirely devoted to whether the defendant was mentally ill within the meaning of General Statutes § 53a-13. The only reference to the cognitive aspect of the insanity defense came in the following question and answer: "Q. [by the state's attorney] Doctor, on the basis of your examination, your training and experience, and the interview that you conducted, the various data that you had to work with, do you have an opinion as to whether or not on March 1, 1978, Mr. Torrence was as a result of mental disease or defect lacking substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law? A. I found no evidence that Mr. Torrence is unable to understand the difference between right and wrong. I found no evidence that because of a mental illness he is unable to conform his conduct to the requirements of the law." It is clear that, in stating that he found no evidence of the defendant's inability to distinguish right from wrong, Arafeh was answering that part of the question asking, in the statutory language, whether the defendant lacked capacity to appreciate the wrongfulness of his conduct. The answer was not literally responsive to the form of the

question and threatened to pour the wine of old case law into the new statutory bottle. We must conclude, however, that the jury heard it, not in isolation, but essentially as a negative answer to the properly phrased question. This one sentence, moreover, is the only reference, in a total of 275 pages of testimony from three experts, relating to the cognitive aspect of the insanity defense. We note, furthermore, that the defendant did not ask that the response be stricken, a fact that we cannot ignore. See *State* v. *Kurvin,* supra, 563–64. Under these circumstances, we cannot conclude that it is reasonably possible that the jury was misled.

The second sentence to which the defendant points is as follows: "It would not include a mind which, while weak or incapable in some measure, is still sound enough to make an essential choice in the course of conduct." See footnote 6, supra. This does refer to the volitional element of the defense. The defendant argues that, because the use of this sentence has in other cases been followed by language incorporating the abandoned irresistible impulse test, which was the volitional element of the prior law; see *State* v. *Toste,* supra, 630–31; the trial court improperly injected that test into this case. We disagree. Nowhere does there appear any reference to the notion of irresistible impulse. The jury was properly told twice before and once after this challenged sentence that the test was whether the defendant lacked substantial capacity to conform his conduct to the requirements of the law. Due process is not concerned with claims of error which appear only "upon microscopic examination of the trial record." *State* v. *Kurvin,* supra, 564. Assuming arguendo that it was erroneous to include this rather innocuous language, we conclude that it is not reasonably possible that the jury was misled by it.

## II

The defendant's remaining claims of error require little discussion. He argues that it was error to deny his pretrial motion to sever the trial of the first set of offenses from that of the second. It is clear that the two sets of charges, connected by that charge arising out of the chase, involve a continuum of criminal conduct albeit separated by several hours; that there is no showing of the likelihood of confusion between the two; that some of the evidence of the second set would have been admissible on the first as evidence of hiding and flight bearing on consciousness of guilt; and that some of the evidence of the defendant's defense of insanity on the second set was related to the first.[7] The defendant has not borne his heavy burden of showing a manifest abuse of discretion in denying severance. *State* v. *King,* 187 Conn. 292, 302, 445 A.2d 901 (1982).

The defendant's final claim is that there was not sufficient evidence of an abduction; see General Statutes § 53a-94 (a); to support the conviction of kidnapping. We disagree. There is neither "any time requirement for the restraint, nor any distance requirement for the asportation to constitute the crime of kidnapping." *State* v. *Chetcuti,* 173 Conn. 165, 170, 377 A.2d 263 (1977). The defendant's conduct toward the kidnapping victim here was sufficient to support his conviction under the statute. See *State* v. *Bell,* 188 Conn. 406, 416, 450 A.2d 356 (1982).

There is no error.

In this opinion the other judges concurred.

---

[7] Brauer testified, for example, that the defendant's hiding in the basement was symptomatic of his paranoia, which was a basis for his defense against both sets of charges.