STATE OF CONNECTICUT *v.* THOMAS FARRAR
(3245)

STATE OF CONNECTICUT *v.* CLINTON LANGLEY
(3253)

DUPONT, C. J., BORDEN and DALY, Js.

Argued February 5—decision released April 22, 1986

*John R. Williams,* with whom, on the brief, was *Barbara Goren,* for the appellants (defendant in each case).

*James G. Clark,* deputy assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Mary Galvin,* assistant state's attorney, for the appellee (state).

BORDEN, J. In these combined appeals, the defendants appeal from the judgments of conviction. Both defendants were convicted of attempted sexual assault in the first degree, in violation of General Statutes §§ 53a-49 (a) and 53a-70 (a), and robbery in the first degree, in violation of General Statutes § 53a-134 (a) (3). The defendant Thomas Farrar was also convicted of carrying a dangerous weapon, in violation of General Statutes § 53-206 (a). Each defendant raises five identical claims of error, the most serious of which is that the trial court committed reversible error by instructing the jury that they could use a "more probable than not" standard in drawing inferences from circumstantial evidence. The defendants raise four other claims of error: (1) the denial of their motions to suppress identification testimony by the victim; (2) the improper exclusion of evidence offered by them; (3) the improper denial of access by their counsel to the victim and her family during the trial; and (4) the lack of effective assistance by their trial counsel. We find no error.

The jury could have reasonably found the following facts: On February 13, 1983, the day before the victim's birthday, there was a blizzard in New Haven. While the victim was shoveling snow at her house after work, she saw two men loitering across the street. That evening, she attended a birthday party for herself and a neighbor at the neighbor's house. After returning to her home at about 4:30 a.m., she left to buy cigarettes at an all-night convenience store on Dixwell Avenue. About three or four houses from her house, she was attacked by two men. A tall black man grabbed her around the neck, and she felt a sharp object in her back. The man told her he had come back because she told the first time. See footnote 1, infra. As she broke free, the man grabbed the back of her pants, breaking the front fasteners. She ran across the street, where a second black man, shorter than the first, grabbed her, saying "I'm gonna have sex with you." As he grabbed her, he broke the chain of a "Happy Birthday" medallion which she was wearing, and which she felt slide off her neck. She heard the first man yell to the second to let her go because it was not worth it. The second man responded that "he was going to get it anyway." When she saw them, she realized that they were the same men who had sexually assaulted her the previous October.[1] She looked carefully at their faces and recognized them. She also recognized them as the two men who had been loitering across the street while she was shoveling snow the previous afternoon. The second man tried to pull down her pants but she managed to escape and run to the convenience store, where the attendant called the police, who arrived shortly thereafter. The victim described the men to the police as two black men, one about 6 feet to 6 feet, 4 inches tall and wearing a tan

[1] The victim testified that the previous October, in the same general vicinity, she had been raped by the same two men, but that she did not report that incident to the police because they threatened to come back and kill her if she did.

waist-length jacket, wool cap and jeans; the other as shorter, and wearing a red or burgundy jacket.

Meanwhile, officer Daniel Lorenz of the New Haven police department, armed with the description of the two men, stopped Farrar for questioning on Sheffield Street, which is in the same general neighborhood. Shortly thereafter, the defendant Clinton Langley stepped out of the shadows. Lorenz detained them and radioed to the police at the convenience store that suspects were detained. The police brought the victim to the scene of the detention on Sheffield Street. She immediately recognized the men as her assailants and positively identified them. The defendants were arrested and searched. Farrar was carrying a knife, and in his pocket was the victim's broken chain and "Happy Birthday" medallion.

## JURY CHARGE ON CIRCUMSTANTIAL EVIDENCE

The trial court, in charging the jury on circumstantial evidence and drawing inferences, instructed them that they could draw inferences from the circumstantial evidence if "the inference that you are asked to draw or that you consider drawing is not only logical and reasonable but it is strong enough so that you find *that it is more probable than not that the fact to be inferred is true.*" (Emphasis added.)[2] The defendants

---

[2] The entire charge on circumstantial evidence, of which the quoted language in the text is a part, was as follows: "I'd like to talk to you for a few minutes about circumstantial evidence and it's a phrase that you've all heard in your past lives. It's a phrase or consideration that some of you may or may not be more familiar with than others. Proof beyond a reasonable doubt does not mean that you must have direct evidence supporting every fact or any fact. You may apply a rule of circumstantial evidence. This rule involves the offering of evidence of facts from which you are asked to infer the existence of another fact or set of facts. Such an inference may be made provided two elements in the application of this rule are satisfied. Firstly, that the fact which you are asked to draw—The fact from which you are asked to draw an inference has itself been proven beyond a reasonable doubt. *Secondly, that the inference that you are asked to draw or*

claim that this charge unconstitutionally diluted the state's burden of proof to establish guilt beyond a reasonable doubt, and that the recent case of *State* v. *Rodgers,* 198 Conn. 53, 56–59, 502 A.2d 360 (1985), is dispositive. The state responds that the charge, if erroneous, does not constitute reversible error, and that the recent case of *State* v. *Reddick,* 197 Conn. 115, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986), is dispositive.[3] These two competing claims require us to confront these two Supreme Court decisions, which are certainly divergent in result and appear at first glance to be divergent in approach.

On August 6, 1985, the Supreme Court decided *State* v. *Reddick,* supra, where the trial court used language in its jury charge; id., 130 n.4; identical to the language which the defendants challenge in this case. The Supreme Court, reading the challenged language not in isolation but as part of the overall charge, and considering the likely effect of that overall charge on the

---

*that you consider drawing is not only logical and reasonable but it is strong enough so that you can find that it is more probable than not that the fact to be inferred is true.* In summary it's your right to draw inferences if you conclude the fact you find proven reasonably establish [sic] other facts by reason and logic and are not the result of speculation, surmise or guess work. If from the facts you find proven you reasonably infer such other facts you may then use such other facts so inferred as the basis for inference or inferences that other facts exist including facts that go to establish guilt or innocence of either or both of the defendants." (Emphasis added.)

[3] Because they did not take an exception to the charge as given, the defendants seek review under the *Evans* bypass. *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). Their claim is sufficiently similar to the kind of burden-shifting claim for which the Supreme Court has afforded *Evans* review; see *State* v. *Williams,* 199 Conn. 30, 33, 505 A.2d 699 (1986); that we will invoke our "principled appellate discretion"; *State* v. *Cosby,* 6 Conn. App. 164, 172, 504 A.2d 1071 (1986); and review it. Furthermore, appellate review is appropriate here as an attempt to resolve the apparent conflict between the two recent Supreme Court cases on which the defendants and the state rely.

jury, held that "[o]n this record, it is not reasonably possible that the jury was misled by the alleged errors in the court's instructions." Id., 132. While not explicitly saying that the challenged language was erroneous, its conclusion that it was not reasonably possible that the jury was misled by the charge was an implicit suggestion that the charge was erroneous, and it was an explicit holding that the error was nonetheless not reversible. See *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982); *State* v. *Torrence,* 1 Conn. App. 697, 703–704, 476 A.2d 598 (1984), aff'd, 196 Conn. 430, 493 A.2d 865 (1985). In reaching this conclusion, the court emphasized that, despite the challenged language, the trial court, by its repeated references to the proper burden of proof, "made abundantly clear to the jury that the burden of proof as to every element of the offenses charged was on the state, and that this burden had to be satisfied beyond a reasonable doubt." *State* v. *Reddick,* supra. The court also emphasized, in responding to a related argument by the defendant, that "[i]n the case before us, intent was not a disputed element; identification was the only contested issue." Id., 133.

On December 17, 1985, the Supreme Court decided *State* v. *Rodgers,* supra, in which the trial court used language in its jury charge almost identical to the language which the defendants challenge in this case. The Supreme Court, without distinguishing, citing or referring to *State* v. *Reddick,* supra, agreed with the defendant "that the requisite standard of proof beyond a reasonable doubt was impermissibly diluted by the trial court's instruction that an inference may be drawn [from circumstantial evidence] provided 'that it is more probable that the fact to be inferred is true.' " *State* v. *Rodgers,* supra, 57.

The defendants claim that *Rodgers* overruled *Reddick* sub silentio. We are not prepared to indulge in the pre-

sumption that the Supreme Court would so cavalierly overrule such recent authority without even acknowledging that it was doing so. Although the two cases do appear to evince two divergent appellate approaches to the same claim, a careful reading of *Rodgers* convinces us that it is distinguishable from *Reddick,* and that the two peacefully coexist.

In *Rodgers,* the court emphasized that "[m]uch of the evidence produced by the state was circumstantial evidence, especially that bearing on the issue of criminal intent as it related to the crimes charged in the substitute information." Id., 58. It also emphasized that "[t]he trial court twice gave . . . [the challenged] instruction to the jury, once during its general instructions on burden of proof, and again during its specific instructions on the elements of sexual assault in the first degree." Id., 58 n.2. In *Reddick,* however, the court emphasized that the evidence against the defendant was principally identification, not circumstantial, evidence, that intent was not a disputed issue, and that the challenged instruction was not repeated as part of the definitions of the elements of the charged offenses.

The differing analyses in these two cases are consistent with the established principle that the trial court's instructions must be examined with reference to the factual issues in the case. *State* v. *Torrence,* supra, 705; *State* v. *Grant,* 6 Conn. App. 24, 28, 502 A.2d 945 (1986). Where the principal factual issue is intent, which is characteristically proven by circumstantial evidence; see *State* v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986); the trial court's instructions regarding the use of circumstantial evidence as proof of this essential element are subject to close scrutiny. See *State* v. *Rodgers,* supra, 58. Where, as here, the principal factual issue is identity, which is not classically dependent upon circumstantial evidence for its proof, the trial court's instructions may be read as a whole to determine

whether it is reasonably possible that the jury was misled by an erroneous explanation regarding the use of circumstantial evidence. See *State* v. *Reddick,* supra, 133.

It is clear that the present case falls within the confines of *State* v. *Reddick,* supra, and outside the confines of *State* v. *Rodgers,* supra. The state's evidence, while bolstered by the circumstantial evidence of Farrar's possession of the victim's medallion and of a knife, was based primarily on the direct evidence of the victim's testimony and identification of the defendants as her assailants. Identity, not intent, was the disputed issue. Indeed, both defendants claimed and offered evidence of alibi. As in *Reddick,* the trial court in this case made repeated references to the state's burden of proof beyond a reasonable doubt, both in its general instructions and in its specific instructions on intent. Furthermore, unlike *Rodgers,* in this case the trial court gave the challenged instruction but once, as part of its general instructions on circumstantial evidence, and did not repeat it when defining the essential elements of the crimes charged. We conclude, therefore, that although it was error for the court to charge as it did, considering the overall charge and its likely effect on the jury, it is not reasonably possible that the jury was misled. *State* v. *Reddick,* supra, 132. The error, therefore, was not reversible.

### IDENTIFICATION OF THE DEFENDANTS

Both defendants filed motions in limine to suppress the evidence of the victim's identification of them. After a hearing, the court denied the motions and the defendants duly excepted. The victim then testified to her out-of-court identification of the defendants, and identified them in court as well. The defendants claim that the court erred in denying their motions. We disagree.

Whether an identification procedure offends due process depends (1) on whether it was impermissibly and unnecessarily suggestive, and (2) if so, on whether the identification was nonetheless reliable based on the totality of the circumstances. *State* v. *Amarillo,* 198 Conn. 285, 292, 503 A.2d 146 (1986); *State* v. *Anderson,* 6 Conn. App. 15, 19–23, 502 A.2d 446 (1986).

Although, as the state concedes, the out-of-court show-up here was suggestive; see *State* v. *Mitchell,* 7 Conn. App. 46, 64, 507 A.2d 1017 (1986); the defendants have not met their burden of establishing that the suggestive procedure was also impermissible and unnecessary. Id.; *State* v. *Anderson,* supra, 20–21. The show-up took place on the street, in the early morning hours, less than an hour after the assault, and within minutes after the investigative detention of the defendants. Thus, a lineup was not feasible, since the defendants were not in custody and a lineup would have caused considerable delay. *State* v. *Willin,* 177 Conn. 248, 252, 413 A.2d 829 (1979). The confrontation took place when the victim's recollection was fresh, when the need of the police either to establish probable cause or dispel their suspicion was acute, and when, if probable cause were established, the necessity of searching the defendants was strong. *State* v. *Mitchell,* supra. This conclusion that the out-of-court identification was not impermissibly suggestive renders it unnecessary to consider whether that identification was nonetheless sufficiently reliable to go to the jury, and whether the in-court identification was irrevocably tainted. Id. The court did not err in admitting the identification of the defendants by the victim.

## THE DEFENDANTS' CLAIM OF EVIDENTIARY ERROR

The defendants sought to introduce into evidence a part of a metal chain Farrar claimed to be part of the medallion chain which the police seized from him upon

his arrest. He claimed that the chain seized from him had been given to him by a relative, and that the proffered part of the metal chain had been in his jewelry box at his home from the time of his arrest until he gave it to his attorney a week before the trial. The court sustained the state's objection on the ground that the defendants had not established a proper foundation by way of a chain of custody, prior to Farrar's turning the metal chain over to his attorney, so as to establish that the proffered item had not been altered. This ruling was based in part upon Farrar's testimony that others had access to the jewelry box. The defendants neither excepted to this ruling nor claimed, as they do on appeal, that their fundamental constitutional right to present a defense was violated by this offer of evidence. Thus, they seek review under the *Evans* bypass. *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973).

The defendants' *Evans* effort founders because the record simply does not support their claim that the ruling of the trial court clearly deprived them of a fundamental constitutional right and a fair trial. *State* v. *Lopez,* 5 Conn. App. 599, 602–603, 502 A.2d 418 (1985). This single evidentiary ruling was "not of constitutional dimension." *State* v. *Brown,* 199 Conn. 14, 24, 505 A.2d 690 (1986). The ruling concerned whether a proper evidentiary foundation had been laid. " 'That is not an issue of constitutional.dimension, but rather of the trial court's discretion.' " Id.[4] " 'Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. In this

---

[4] We note that the Supreme Court reviewed a similar ruling in *State* v. *Stepney,* 191 Conn. 233, 243–46, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984), in which the trial court excluded blood-stained trousers offered by the defendant, on the ground that an insufficient foundation had been laid. The Supreme Court held that the ruling was discretionary, and that the trial court had not abused its discretion. Id., 246.

instance, the defendant has put a constitutional tag on a nonconstitutional claim.' *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985)." *State* v. *Cosby,* 6 Conn. App. 164, 167, 504 A.2d 1071 (1986).

## THE DEFENDANTS' CLAIM OF IMPROPER DENIAL OF ACCESS BY COUNSEL TO THE VICTIM AND HER FAMILY

The defendants claim that the trial court denied them their rights to due process, to compulsory process and to effective assistance of counsel, by prohibiting their counsel from interviewing the victim and members of her family during the trial. They seek review of this claim under *Evans.* This claim commands no legitimacy whatsoever under *Evans;* we therefore decline to review it. Indeed, it has so little connection to the reality of what took place at the trial that we can only conclude that the defendants' appellate counsel, who was not their trial counsel, has permitted zeal of advocacy to overwhelm any modicum of fidelity to the record.[5]

The trial began on March 2, 1984, approximately one year after the date of the incident in question. At the end of the first day, after the completion of the victim's direct examination, a colloquy took place among the assistant state's attorney, the court and the defense counsel, which is quoted in full in the footnote.[6] From

---

[5] This is not the first time we have noted that this particular appellate counsel, who had not tried the case, has resorted to claims on appeal "which are totally unsubstantiated by anything in the record." *Yale Literary Magazine* v. *Yale University,* 4 Conn. App. 592, 603 n.4, 496 A.2d 201 (1985); cert. granted, limited to different issue, 197 Conn. 819, 501 A.2d 389 (1985). Apparently, he has not heeded our admonition that such tactics "have no place in appellate practice and cannot be tolerated." Id.

[6] "Ms. Galvin [Assistant State's Attorney]: . . . [T]here is additional matter that I'd like to alert the court on before we recess tonight.

"Both of these Defendants are currently released on fairly substantial bonds with no condition on those bonds and in light of my discussion with the victim over the past days there are obvious intimidations being impor-

this record, the defendants' appellate counsel imagines a scenario in which "the trial court upon the State's oral motion entered an order . . . making it a condition of the defendants' bond that the defendants 'have

---

tant, Your Honor, I would move that a special condition be attached to the bonds of each of these Defendants that they have no contact direct or indirect with the victim or any member of her family while this case is pending.

"The Court: Mr. O'Donnell

"Mr. O'Donnell [Defense Counsel]: So long that incidental contact that is they are ten blocks apart and she lives on Dixwell Avenue which is an avenue which may well be traveled frequently. As long as incidental contact isn't misconstrued.

"Ms. Galvin: Well, your Honor—

"The Court: Well I would think that under the circumstances that your clients would be well advised to ensure that there is [not] even incidental contact and—

"Mr. O'Donnell: I'll advise them of such.

"The Court: I would say so because they're you know—There shouldn't be—Nothing should occur that would give the Court and I'm just saying this for your benefit, Gentlemen. There are things that occur or can occur during the trial that can be admitted into evidence as evidence or actions showing a consciousness of guilt or obstruction of justice. I see very few incidents of it. I have [sic] incidents of obstruction of justice in New London last year and it resulted in the [sic] and it was a serious incident and it resulted in the ramification of a bond and the setting of no bond during the trial. We don't need you know anything like that. *So I think I'll impose it as an additional condition of their probation. Keep yourselves well absent from anything to do with that.* Now if you want to ask me something ask it through your lawyer, would you?

"Ms. Galvin: That's as to bond, Your Honor.

"The Court: Bond.

"Ms. Galvin: Thank you, Your Honor.

"Mr. O'Donnell: Your Honor, Mr. Langley's only concern and I think it relates to the incidental contact that I mentioned. He believes that the victim's brother is a fireman at the same station that Mr. Langley's brother is a fireman.

"Ms. Galvin: It's my understanding that Mr. Langley's brother has been transferred from that fire house where someone who does have a relationship with the victim works. It's my understanding that his brother works at Dixwell Station. The person who has contact with the victim does not work at Dixwell Station.

"The Court: Well. What ever.

"Mr. O'Donnell: That's his only concern that that contact—

"The Court: What does this have to do with his brother's contact? It can only relate to him and there are a couple of cases out of this state and other

no contact direct *or indirect* with the victim or any
member of her family while this case is pending.' "
(Emphasis supplied in defendants' brief.) On this foun-
dation, counsel builds the argument that the trial court
"enter[ed] an order on the first day of trial that effec-
tively prohibited defense counsel from interviewing the
complainant and members of her family during the pen-
dency of the trial," thus violating the defendants' rights
to prepare a defense, to secure witnesses by compul-
sory process and to receive the effective assistance of
their counsel.

The fundamental flaw in the defendants' argument
is that there is no indication whatsoever in this record
that anyone in the courtroom—the defendants, their
counsel, the assistant state's attorney or the trial
judge—understood the court's ruling to be anything like

jurisdictions where there have been examples of attempts to impede the
trial or the process by the use of a third person. Those actions if they're
established can be included to Defendants. They and I want you gentle-
men to realize I'm not saying this because I have any belief that you're
going to do this. I'm responding this way because the question has been
raised by the State's Attorney. I am not anxious to see anything happen
that's going to place any additional obstacle into the case for anybody and
I don't want anybody that's connected with the case to have any difficulty
whatsoever. Whether they're connected to the case through the Defend-
ant's standpoint or connected through the State's standpoint. If there's
contact between his brother and the brother of [the victim] or relative of
[the victim] they better each talk to their relatives and say look. We've got
a serious matter going on in Superior Court. Do me a favor and you know
just for a while stay apart or do whatever you have to do. That's not an
order. That's a suggestion.
    "Ms. Galvin: I've already done that as far as our side's concerned, Your
Honor.
    "The Court: I think these gentlemen understand what I'm saying. I cer-
tainly hope they do.
    "Mr. O'Donnell: If they don't, Your Honor, I'll explain it further.
    "The Court: I want them to understand I'm not saying it because I per-
sonal[ly] think these things are going to happen. As a Judge I have to
respond to questions that are raised on the record by either one of the law-
yers and that's all I'm doing here. Alright. Recess till Monday." (Empha-
sis added.)

what the defendants' appellate counsel characterizes it to be. Indeed, the indications are all to the contrary. The record discloses that the state's motion was prompted by recent discussions with the victim which suggested intimidation of her by the defendants. See Practice Book § 667. The ruling of the trial court applied only to contact between the defendants themselves and the victim, not to members of her family, and certainly not to any effort by the defendants' counsel to interview her or anyone else. See footnote 6, supra. There is no indication that their counsel deemed it necessary to interview her or her family at this stage of the proceedings, one year after the arrest of the defendants and after the victim had completed her direct testimony. Furthermore, the ruling of the court was not what the defendants' appellate counsel quotes it to be, namely, that the defendants "have no contact direct *or indirect* with the victim or any member of her family while this case is pending." (Emphasis added in defendants' brief.) This language is from the state's oral motion; it is not from the court's ruling. The language of the court's ruling was quite general. After some remarks about consciousness of guilt and obstruction of justice, the court said: "So I think I'll impose it as an additional condition of their [bond]. Keep yourselves well absent from anything to do with that." It is not at all clear from this printed record what "that" refers to, but it is clear that neither the defendants nor their counsel understood it as imposing limits on counsel's activity on their behalf. Certainly, he did not fear that interviewing the victim or members of her family could be construed as consciousness of guilt or obstruction of justice by his clients. The defendants and their trial counsel were content with the ruling. It is also noteworthy that in discussing the inadvisability of contact between Langley's brother and any relative of the victim, the court said: "That's not an order. That's a

suggestion. . . . I think these gentlemen understand what I'm saying. I certainly hope they do." Their counsel responded: "If they don't, Your Honor, I'll explain it further." An unbiased reading of the entire colloquy indicates that the court's ruling and suggestion were animated, in part at least, by the hope that the defendants avoid inadvertent contact with the victim which could later redound to their detriment.

"We therefore conclude that the defendant[s'] claim on appeal fails to pass the first of the three requirements for an *Evans* review, namely, that the record supports a claim that the trial court's action raises a question of fundamental constitutional dimension." *State* v. *Cosby,* supra, 171–72. This chimerical claim is nothing more than an attempt on appeal to turn the trial into "a Kafkaesque academic test which [the trial judge] may be determined on appeal to have failed because of questions never asked of him or issues never clearly presented to him." *State* v. *Cosby,* supra, 174.

### THE DEFENDANTS' CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The defendants' final claim is that, on the face of the record, their trial counsel's conduct fell far below the constitutionally mandated standard of competent counsel. This claim is disposed of by the recent case of *State* v. *Leecan,* 198 Conn. 517, 541, 504 A.2d 480 (1986), where the Supreme Court held that all claims of ineffective assistance of counsel, whether based solely on the trial record or requiring an evidentiary hearing, should be determined by way of a habeas corpus action. See *Sutton* v. *Robinson,* 6 Conn. App. 518, 520–21, 506 A.2d 566 (1986).

There is no error.

In this opinion the other judges concurred.