STATE OF CONNECTICUT *v.* LAWRENCE J. MILLER, JR.
(12490)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and NOVACK, Js.

464

Argued November 6, 1986—decision released March 10, 1987

*Richard Emanuel,* for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom were *John M. Massameno,* assistant state's attorney, and, on the brief, *Walter D. Flanagan,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant was charged in an information with two counts of the crime of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] After a jury trial, he was found guilty of both counts and sentenced to consecutive terms of imprisonment.

He has appealed claiming that: (1) his statutory and constitutional rights were violated by the administration of defective oaths to the voir dire panel and to the petit jury; (2) the trial court erred in denying his motion

---

[1] General Statutes § 53a-59 (a) (1) provides in pertinent part: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

to suppress identification evidence; (3) his right to be tried by an impartial jury was violated by the denial of his motion to transfer the prosecution; (4) the trial court erred by admitting irrelevant evidence; (5) his rights were violated by the exclusion of the results of a polygraph examination from evidence; (6) the evidence was insufficient to establish his guilt beyond a reasonable doubt; and (7) his constitutional rights were violated by the trial court's instructions on circumstantial evidence. We find no error.

The jury could reasonably have found the following facts. On the evening of August 20, 1981, at approximately 8:30 p.m., fifteen year old Elizabeth, and a sixteen year old male friend, William, were viciously assaulted behind the United Methodist Church on Clapboard Ridge Road in Danbury. The assault took place in an area used as a gathering place by neighborhood youths. Their assailant was a white male whom the couple encountered as they were leaving the area to walk to Elizabeth's house a short distance away. When he approached the young people, the assailant, who was wearing a bandana across the lower portion of his face, grabbed William's arm, displayed a handgun and identified himself as a police officer.

The couple was forced at gunpoint to walk to a grassy area where William was made to kneel. The assailant produced handcuffs and, using one hand, quickly handcuffed William's wrists behind his back. William was instructed to lie on his stomach and the assailant removed his own belt, and bound William's ankles. He then grabbed Elizabeth's arm and pulled her down an embankment out of William's sight. She was ordered to remove her jacket and, when she refused, a struggle ensued. During the struggle, the girl punched and scratched her assailant, and the man struck her several times on the head with the gun. In the course of the struggle with Elizabeth, the bandana, which the

assailant had been wearing, came off his face. Thereafter, Elizabeth stumbled, fell to the ground and lost consciousness. When she revived, the man, his face uncovered, was crouched a few feet from where she lay. He then grabbed her foot and began dragging her further down the embankment. While he was doing so, Elizabeth's sneaker came off. She recovered it and threw it at her assailant, striking him in the crotch area. This precipitated another struggle during which the assailant kicked Elizabeth in the stomach, and repeatedly struck her about the head with the gun until she again lost consciousness.

Approximately five or ten minutes after pulling Elizabeth down the embankment the man returned to William. He removed the belt from around William's ankles and placed it around William's chin. The assailant then pulled on the belt and shoved the gun in William's mouth, injuring him. The belt was then slipped around William's neck and tightened, strangling him until he lost consciousness. When William regained consciousness, the man was gone and William made his way to Elizabeth's house where he alerted her parents and help was summoned. A search was immediately launched and Elizabeth was found lying in the area behind the church in a semi-conscious state, partially naked and covered with blood.

Both victims were taken to the Danbury Hospital that night. Elizabeth's injuries consisted of a laceration of the liver, a fractured jaw, fractures of her hands, and numerous head and facial lacerations. She required surgery, and was hospitalized for a period of three to four weeks, a portion of which she spent in intensive care. William's injuries included multiple head and facial lacerations, and a laceration of the soft palate caused when the barrel of the assail-

ant's gun was jammed into his mouth. He was confined to the hospital for a week.

At trial Elizabeth made a "positive" in-court identification of the defendant as her assailant. She also testified that she had made an out-of-court photographic identification of the defendant, at Danbury police headquarters on April 1, 1982. She further testified that she had positively identified the defendant as her assailant at a chance meeting in the area of the checkout counters at the Bradlees Department Store in Danbury on July 12, 1982. It is undisputed that the meeting at Bradlees was inadvertent and that it was not arranged by the police. William, who never saw his assailant without the bandana covering the lower portion of his face, was unable to make an identification of the defendant.

The defendant, who was employed at the time of the crime as a correction officer at the federal correctional institution in Danbury, testified at his trial. He denied his involvement in the incident, offered an alibi defense and testified that at the time of the crime, he was visiting at the home of his sister in Brewster, New York. His testimony was supported by the testimony of his sister, his mother, his wife and a friend of the defendant's sister.

I

The defendant first claims that his statutory and constitutional rights were violated by the administration of defective oaths to both the voir dire panel and the petit jury. Practice Book § 847 states in pertinent part that "[t]he judicial authority shall cause prospective jurors to be sworn or affirmed in accordance with Gen. Stat., §§ 1-23 and 1-25." General Statutes § 1-25 sets forth the forms of oaths for, inter

alia, voir dire and for petit jurors in a criminal cause.[2] In administering the voir dire oath, the trial court omitted the "well and truly" language of the oath, and in administering the jury oath, the phrase "by the name of the ever-living God" was omitted. Although the defendant acknowledges that he did not object to the defective oaths at trial, he seeks review of his claims pursuant to (1) *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973), which permits review of newly raised claims of error "where the record adequately supports a claim that a litigant has clearly been deprived of a fundamental constitutional right and a fair trial," and (2) Practice Book § 4185 (formerly § 3063), which permits this court "in the interest of justice [to] notice plain error not brought to the attention of the trial court." We conclude that neither one of these exceptions to our rule against appellate review of unpreserved claims of error applies to the circumstances of this case.

First, the defendant puts a constitutional tag on a nonconstitutional claim by asserting that the deviation from the statutory form for oaths constitutes a depri-

---

[2] "[General Statutes] Sec. 1-25. FORMS OF OATHS. The forms of oaths shall be as follows, to wit:

\* \* \*

"FOR PETIT JURORS IN CRIMINAL CAUSES.

"You solemnly swear by the name of the ever-living God, that you will, without respect of persons or favor of any man, well and truly try, and true deliverance make, between the state of Connecticut and the prisoner at the bar, whom you shall have in charge, according to law and the evidence before you; your own counsel, and your fellows', you will duly observe and keep; you will speak nothing, to any one, of the business or matters you have in hand, but among yourselves, nor will you suffer any one to speak to you about the same, but in court; so help you God.

\* \* \*

"VOIR DIRE.

"You solemnly swear that you will well and truly answer such interrogatories as shall be put to you, under the direction of the court, not immediately relating to the merits of the cause now in question; so help you God. . . ."

vation of a fundamental constitutional right. See *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982). We are unaware of a constitutional right to any particular form of an oath. The defendant also suggests that he was deprived of a fundamental constitutional right because the defective oaths impaired his right to a "meaningful voir dire" by frustrating his opportunity to elicit grounds for challenge for cause and by inhibiting the intelligent exercise of his right to peremptory challenges. We disagree. The record does not support the assertion that the oaths administered in this case resulted in any impairment of the voir dire process. As we stated in *State* v. *Gooch,* supra, "the *Evans* trial court bypass to this court is a narrow constitutional path and not the appellate Champs-Elysees." The defendant's reliance on *Evans* is without foundation.

Nor does the defendant's claim warrant review under the plain error doctrine, because we cannot conclude that the trial court's administration of the defective oaths resulted in any manifest injustice in this case. See *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985). "Such review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." Id. This is not such a case. Cf. *State* v. *Burke,* 182 Conn. 330, 331–32, 438 A.2d 93 (1980); *Hartford Federal Savings & Loan Assn.* v. *Tucker,* 181 Conn. 607, 609, 436 A.2d 1259, cert. denied, 449 U.S. 956, 101 S. Ct. 363, 66 L. Ed. 2d 221 (1980). We conclude, therefore, that the defendant's acquiescence throughout trial constituted a waiver of any objection to the trial court's deviation from the statutory language governing the administration of oaths. See *State* v. *Glaros,* 170 Ohio St. 471, 166 N.E.2d 379 (1960); cf. *State* v. *Hoyt,* 47 Conn. 518, 528–29, 36 A. 89 (1880).

## II

The defendant next claims that his federal and state constitutional rights to due process of law were violated by the trial court's denial of his motion to suppress both the out-of-court and in-court identifications of him made by Elizabeth. As previously noted, at trial she made a "positive" in-court identification of the defendant as her assailant, and also testified that she had selected his photograph from an array on April 1, 1982, and had identified him at a chance meeting in Bradlees Department Store in Danbury on July 12, 1982.

"A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984). " 'In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the "totality of the circumstances." *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).' " *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985). Only if the procedures used to identify the accused are unnecessarily suggestive are we required to analyze the factors that determine the reliability of an identification for due process purposes. *United States* v. *Amrine,* 724 F.2d 84, 87 (8th Cir. 1983); *United States* v. *Hurt,* 476 F.2d 1164, 1168 (D.C. Cir. 1973); *State* v. *Amarillo,* 198 Conn. 285, 294, 503 A.2d

146 (1986). In this case the trial court found that the identification procedures employed "were not at all suggestive." We agree.

The evidence adduced at a hearing on the defendant's motion to suppress identification and at trial revealed that from the date of the assault on August 20, 1981, until April 1, 1982, Elizabeth viewed approximately 400 photographs of white males without making an identification. On April 1, 1982, at the request of the Danbury police, she went to police headquarters and viewed an array of seven color photographs of similar subjects. This array included a photograph of the defendant that had been taken the previous day. Elizabeth selected the defendant's photograph from the array as depicting her assailant, and indicated she was 99 percent sure of her identification, but she could not be more definite unless she saw the subject of the photograph in person.

The defendant first argues that the procedure and the photographs utilized in obtaining the identification on April 1, 1982, were in themselves unnecessarily suggestive. A review of the testimony concerning the presentation of the array and the photographs included in it, however, demonstrates that the April 1, 1982 identification procedure was conducted fairly and was not in the least suggestive. See *United States* v. *Amrine,* supra; *State* v. *McKnight,* 191 Conn. 564, 571, 469 A.2d 397 (1983). The defendant contends, however, that even if the procedure employed on April 1, 1982, was not itself unnecessarily suggestive, what had transpired previously caused it to be so, and required the trial court to suppress not only the photographic identification secured on that date, but also the subsequent corporeal identification at Bradlees and the in-court identification. We disagree.

The defendant's argument is premised principally on the state's response to a motion for disclosure filed

prior to trial in which it was disclosed that Elizabeth had, at some time prior to making the identification of April 1, 1982, viewed three "old photographs" of the defendant. It is undisputed that one of those "old photographs" was shown to her in January or February, 1982, as part of an array of six small black and white photographs contained in a manila folder. It is impossible to decipher from the record exactly when, or if in fact, the other two "old photographs" were seen by Elizabeth. The defendant theorizes that they were shown to her in September, 1981, when she was at home recuperating from her injuries. The state appears to agree that, if they were shown to her at all, it was at that time when the bulk of the approximately 400 photographs were shown to her. There were undoubtedly two "old photographs" of the defendant in the possession of the Danbury police showing him in casual poses with another person. The two police officers primarily responsible for conducting the identification procedures with Elizabeth, however, deny ever having shown them to her. We will credit the state's response to the defendant's motion for disclosure and the defendant's theory as to when these two "old photographs" of the defendant were shown, and assume, arguendo, as does the state in its brief, that they were, in fact, viewed by Elizabeth in September, 1981. It is undisputed that Elizabeth made no identification prior to trial as a result of viewing any of the three "old photographs."[3]

---

[3] At trial Elizabeth testified that the person depicted in one of the "old photographs" of the defendant, which showed him in a casual pose standing with another person, was the man who had attacked her. She also testified that she had seen the photograph at some prior time, which she believed to be after April 1, 1982. This is apparently not the case, however, since there was no evidence that she viewed any photographs after April 1, 1982. She also testified that she did not recognize the man depicted in the other "old photograph" of the defendant, which also showed him in a casual pose, and that she had no recollection of ever having seen the photograph before.

We have recognized that pictorial recurrence can be suggestive because it increases the risk of misidentification. *State* v. *Hinton,* 196 Conn. 289, 292–93, 493 A.2d 836 (1985). We conclude, however, that, under the circumstances of this case, the viewing by Elizabeth of the three "old photographs" of the defendant, prior to her selection of the defendant's photograph on April 1, 1982, did not taint her identification on that date or render the identification procedure suggestive. We come to this conclusion because all three of the "old photographs" allegedly viewed by Elizabeth prior to April 1, 1982, were dissimilar to each other and depicted the defendant as appearing substantially different than he did in the photograph she selected on that date. The "old photographs" have to be studied together with the April 1, 1982 photograph before a connection can be made between them, and even then it is not apparent. Therefore, even though at trial Elizabeth indicated that one of the "old photographs" of the defendant in a casual pose depicted her assailant, it is almost inconceivable that a viewing of that photograph some seven months previous, at a time when she viewed approximately 400 other photographs, influenced her selection of the recent photograph of the defendant on April 1, 1982. The time lapse, the dissimilarity of the photographs viewed, and the difference in appearance of the defendant in the April 1, 1982 photograph, militate against a conclusion that the "old photographs" influenced her subsequent identifications.[4]

The recurrent use of a defendant's photograph in successive arrays is not presumptively suggestive. *United*

___

[4] The "old photograph" viewed by Elizabeth in January or February as part of a six photograph array portrays the defendant as radically different in appearance from the April 1, 1982 photograph. Even at trial, with the defendant in the courtroom, Elizabeth was unable to select his photograph from that array.

*States* v. *Bowie,* 515 F.2d 3, 7–8 (7th Cir. 1975); *State* v. *Boucino,* 199 Conn. 207, 219, 506 A.2d 125 (1986). When a witness first views a photograph in which an accused bears little resemblance to his appearance in another photograph subsequently selected by the witness, the viewing of the earlier photograph does not taint the later photographic identification. *United States* v. *Brown,* 461 F.2d 134, 144 (D.C. Cir. 1972); *State* v. *Evans,* 200 Conn. 350, 355, 511 A.2d 1006 (1986).

Since the initial identification of the defendant on April 1, 1982, was not the result of a suggestive identification procedure, there was no constitutional infirmity in the identification process. It is therefore unnecessary to consider the factors which the defendant claims render the initial identification, the subsequent identification at Bradlees and the in-court identification unreliable. "If an identification procedure is not impermissibly suggestive, the inquiry is ended." *State* v. *Freeman,* 313 N.C. 539, 544, 330 S.E.2d 465 (1985).

The defendant argues that even if we should conclude that the identification procedure was not suggestive, we should, nonetheless, inquire into the reliability of Elizabeth's identifications. He urges us to employ a test limited to a single inquiry, that being the reliability of the identification, and abandon our present two-pronged inquiry. See *State* v. *Austin,* supra, 499. The defendant cited no authority for the adoption of such a position and to adopt it would preempt the traditional role of the jury. Absent an unconstitutional procedure, "evidence with some element of untrustworthiness is customarily grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Manson* v. *Brathwaite,* supra, 116.

The United States Supreme Court decision in *Neil* v. *Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), set forth the factors to be considered in making a determination of reliability. These "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Id., 199–200. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. After a careful review of the record in light of these factors, we conclude that even if the identification procedure employed was unnecessarily suggestive, Elizabeth's out-of-court and in-court identifications were sufficiently reliable under the "totality of the circumstances" to be admissible at trial.

### III

The defendant next claims that the trial court's denial of his motion to transfer prosecution violated his right to a fair trial by an impartial jury, and his right to due process of law, as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. His claim is premised on the prejudicial effect of the pretrial publicity, and particularly a newspaper article published during trial which, he claims, resulted in unconstitutional unfairness as to the method of jury selection and as to the jurors actually chosen. After a review of the record in this case, we conclude that the publicity attending this case did not deprive the defendant of an impartial jury and a fair trial.

The defendant filed a pretrial motion for transfer of prosecution. An evidentiary hearing was held by the trial court during which the following circumstances

were disclosed. The area in which the crimes occurred is served by several newspapers, including the Danbury News-Times (News-Times). The court reporter for the News-Times testified that she had written many of the articles pertaining to the assaults, and that the incident was not treated any differently from other serious crimes that had been reported in the newspaper.

Although the News-Times had published approximately forty news articles and two editorials pertaining to this crime, the majority of these articles had appeared during the time between the date of the offense and the defendant's arrest in July, 1982. The articles described the circumstances of the assaults, contained descriptions of the assailant, and discussed a reward fund. The media accounts of the crimes were derived substantially from court proceedings and interviews with individuals familiar with the events, including one brief interview with the Danbury state's attorney. Concluding that there was insufficient evidence that the publicity had affected any of the potential jurors, the trial court denied the defendant's pretrial motion.

The defendant points to only one specific instance of media coverage that he claims exemplifies the prejudicial nature and effect of the pretrial publicity surrounding this case. On November 1, 1983, after voir dire had commenced, one of the jurors who had been selected to serve on the jury panel, informed the court that the names of the jurors chosen for the panel had appeared in the newspaper. She indicated that she had become apprehensive about serving on the jury because of the article, and that she wished to be excused. The defendant at that point renewed his motion for a transfer of prosecution, but the motion was denied by the trial court.

On the basis of the above, the defendant argues that the pretrial publicity in this case was "inherently preju-

dicial," or, in the alternative, "identifiably prejudicial" so as to render the trial court's denial of his motion to transfer prosecution constitutional error.

At the outset, we note that, when requesting a transfer of prosecution, the defendant bears the burden of showing that he could not receive a fair and impartial trial. *State* v. *Piskorski,* 177 Conn. 677, 685, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Rogers,* 143 Conn. 167, 172, 120 A.2d 409, cert. denied, 351 U.S. 952, 76 S. Ct. 850, 100 L. Ed. 1476 (1956). The determination of whether a transfer of prosecution is necessary is a matter ordinarily entrusted to the sound discretion of the trial court. Nevertheless, "due to the grave constitutional implications attending such pretrial rulings, 'appellate tribunals have the duty to make an independent evaluation of the circumstances.' *Sheppard* v. *Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 [1966]." *State* v. *Piskorski,* supra, 685–86.

" '[T]he general rule is that on appeal a defendant has the burden of proving actual jury prejudice if a conviction is to be reversed on grounds of prejudicial publicity . . . .' " *State* v. *Marra,* 195 Conn. 421, 428, 489 A.2d 350 (1985). "There is no need to show actual prejudice in the jury box 'in extreme circumstances where there has been inherently prejudicial publicity such as to make the possibility of prejudice highly likely or almost unavoidable. See *Estes* v. *Texas,* 381 U.S. 532, 542–43, 85 S. Ct. 1628, 14 L. Ed. 2d 543 [reh. denied, 382 U.S. 875, 86 S. Ct. 18, 15 L. Ed. 2d 118] (1965).' *Calley* v. *Callaway,* 519 F.2d 184, 204 (5th Cir.), cert. denied [sub nom. *Calley* v. *Hoffman*], 425 U.S. 911, 96 S. Ct. 1505, 47 L. Ed. 2d 760 [1976]." *State* v. *Piskorski,* supra, 686. Our decision in *Piskorski* contained a comprehensive analysis of those United States Supreme Court cases in which prejudice was presumed. Id., 686–89; see *Sheppard* v. *Maxwell,* supra; *Estes* v. *Texas,*

supra; *Rideau* v. *Louisiana,* 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963). Unlike those cases discussed in *Piskorski,* the record in this case fails to indicate that either the nature or the extent of the publicity approached the level where prejudice could be presumed.

The publicity surrounding this case was far from inflammatory and there is no showing that the trial proceedings were conducted in an atmosphere "utterly corrupted by press coverage." *Murphy* v. *Florida,* 421 U.S. 794, 798, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975); see *Sheppard* v. *Maxwell,* supra, 354, 356–57; *Estes* v. *Texas,* supra, 536–38. The record indicates that the articles were "straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness." *Beck* v. *Washington,* 369 U.S. 541, 556, 82 S. Ct. 955, 8 L. Ed. 2d 98, reh. denied, 370 U.S. 965, 82 S. Ct. 1575, 8 L. Ed. 2d 834 (1962); *State* v. *Piskorski,* supra, 688. Moreover, there was a significant delay between the majority of the publicity and the time of trial, which lessens the likelihood of jury bias. *Murphy* v. *Florida,* supra, 802; see *Patton* v. *Yount,* 467 U.S. 1025, 104 S. Ct. 2885, 81 L. Ed. 2d 814 (1984). Only a small minority of the potential jurors had anything more than a passing familiarity with the news accounts of the crimes. Cf. *Irvin* v. *Dowd,* 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). It is also noteworthy that none of the articles published prior to trial reported any pretrial confessions or information pertaining to the defendant's guilt or innocence. Cf. *Rideau* v. *Louisiana,* supra, 724. We conclude, therefore, that the pretrial publicity in the present case was not inherently prejudicial so as to deny the defendant his right to a fair and impartial trial.

Absent inherently prejudicial publicity, the defendant must show some connection between the publicity in question and the existence of actual jury prejudice.

*State* v. *Marra,* supra, 430; *State* v. *Piskorski,* supra, 689. "This claim requires us to examine the record to determine whether there was 'constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected.' *Dobbert* v. *Florida,* 432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977)." *State* v. *Marra,* supra, 430–31.

The defendant's claim of actual prejudice is largely premised on the circumstances surrounding the publication of five of the jurors' names in an October 29, 1983 news article. He argues that since some of the jurors were aware that their names had appeared in the newspaper, they must have ignored the judge's admonition not to read any media accounts. This he claims, in combination with the other inflammatory circumstances of this case, demonstrates that the defendant's jury was not fair and impartial. We disagree.

The record in this case reveals that the voir dire examination of individual jurors was extensive and thorough. It was necessary for the parties to question only thirty-five veniremen over a three day period to select the six jurors and two alternates. Only one of the jurors selected to serve on the panel recalled any news accounts concerning the assaults. Once the court was informed that the jurors' names had been published, it questioned each of the jurors individually, and three were excused when they expressed some apprehension about the article. The other two jurors remained on the panel after indicating that the publication of their names would have no effect on their partiality.

The trial court also raised the issue of the article with the full panel of prospective jurors. Eight of the twenty-seven potential jurors indicated that they had not read or heard about the article. The entire panel then indicated to the court that neither the article, nor any discussion concerning it, had influenced them. The court

also instructed the prospective jurors that if any of them had heard about the case through the October 29 article, they could report to the judge in his chambers.[5] Of the six jurors who did speak with the judge, only one indicated any uncertainty as to whether the publication of his name might affect his impartiality. He was excused from the panel.

Thereafter, the trial court allotted the defendant and the state three additional peremptory challenges to compensate for the three jurors who were excused as a result of the article. The remaining jurors then were selected. The defendant had ample opportunity to question the prospective jurors on any bias that may have resulted from the publication of the jurors' names. The defendant's satisfaction with the jury panel is evidenced by his failure to exhaust all the peremptory challenges allotted to him. See *Dobbert* v. *Florida,* supra, 302; *State* v. *Vitale,* 190 Conn. 219, 224–25, 460 A.2d 961 (1983).

The defendant has failed to direct this court to any portion of the voir dire examination which would require a conclusion of constitutional unfairness as to the method of jury selection or as to the jurors actually chosen. We conclude that the trial court did not err in concluding that the defendant was able to obtain a fair trial by an impartial jury in Danbury.

---

[5] "In the meantime if anybody has heard about this case in the manner in which I just explained I would be glad to see you individually in my chambers, and I will have both counsel with me and the court reporter. That is because during a trial a judge cannot meet alone with any jurors for any reason. Okay.

"I think that the first way, rather than have somebody get up and say something in front of 25 people, I think you might be a little more relaxed when you come in my chambers. Please, when you come in my chambers be candid with me. There is nothing formal about it. Just be yourself. . . ."

## IV

The defendant next claims that the trial court erred in two evidentiary rulings during the course of the testimony of a witness for the state. The witness, James Rimel, was the civilian provost marshall for the department of defense supply depot in Mechanicsburg, Pennsylvania. The defense depot supplied, among other equipment, handcuffs to the defense department, justice department and federal correctional institutions. Rimel testified that the particular set of handcuffs removed from William's wrists the night of August 20, 1981, had been purchased from Peerless Manufacturing Company and had been received by the defense depot in Mechanicsburg in 1977. He also testified that the federal correctional institution in Atlanta, Georgia, was one of the institutions supplied with handcuffs by the defense depot in Mechanicsburg. On cross-examination, he testified that he did not know when, or to what governmental agency or institution the particular set of handcuffs involved in the incident had been shipped.

During the course of the trial, evidence was elicited that the defendant was employed from December, 1977, to July, 1978, at the federal correctional institution in Atlanta and, at the time of the assault on Elizabeth and William in August, 1981, was employed as a correction officer in the federal correctional institution in Danbury.

At trial the defendant objected to Rimel's testimony on the ground that it was too "remote and speculative" to prove that the particular handcuffs in question had been supplied to a federal correctional institution where the defendant may have had access to them, and that therefore, Rimel's testimony was irrelevant.

The trial court overruled the defendant's objection, and the defendant duly excepted to the trial court's ruling. We find no error.

The trial court has broad discretion in ruling on the admissibility of evidence. *State* v. *Parker,* 197 Conn. 595, 601, 500 A.2d 551 (1985); *State* v. *DeForge,* 194 Conn. 392, 396, 480 A.2d 547 (1984). "The determination of the relevancy and remoteness of evidence is within the sound discretion of the trial court." *State* v. *Maldonado,* 193 Conn. 350, 365, 478 A.2d 581 (1984). This court will not disturb the trial court's ruling on evidence unless a clear abuse of discretion is shown. *State* v. *Parker,* supra. Evidence is not inadmissible because it is not conclusive; it is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree. *State* v. *Morrill,* 197 Conn. 507, 548, 498 A.2d 76 (1985).

Under the circumstances, where there was evidence that the defendant was employed at federal correctional institutions, testimony that handcuffs of a particular manufacture were supplied to those institutions had some tendency to prove that the defendant may have had access to handcuffs of that brand name. We cannot say that the evidence is so remote that the trial court abused its broad discretion in allowing Rimel's testimony. The defendant's objection goes to the weight of the evidence rather than to its admissibility.

The defendant also claims that Rimel's testimony was inadmissible hearsay because it was based on communications and records from Peerless Manufacturing Company, and that he had no personal knowledge concerning the history of the handcuffs. The defendant acknowledges that he took no exception to the trial court's ruling overruling his hearsay objection to Rimel's testimony, but he urges this court to review

his claim as plain error under Practice Book § 4185.[6] We invoke the power to review a ruling of the trial court as plain error only in extraordinary circumstances "where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985).

In overruling the defendant's hearsay objection, the trial court may have been of the opinion that there was a reasonable necessity for Rimel's testimony and that because it relied on business records, it was supported by guarantees of reliability and trustworthiness equivalent to evidence admitted under the traditional hearsay exceptions. *State* v. *Sharpe,* 195 Conn. 651, 664, 491 A.2d 345 (1985). If that were the case the admission of Rimel's testimony would not have been error at all. Id., 666. We cannot characterize as plain error an evidentiary ruling of the trial court, which may or may not have been correct. In the absence of an exception, we will not further review the trial court's ruling. See Practice Book §§ 288, 3060F (now § 4065); *State* v. *Orsini,* 187 Conn. 264, 269, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); *State* v. *Miller,* 186 Conn. 654, 672, 443 A.2d 906 (1982).

---

[6] "[Practice Book] Sec. 4185 (formerly Sec. 3063). ERRORS CONSIDERED

"The supreme court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The supreme court may in the interests of justice notice plain error not brought to the attention of the trial court.

"In jury trials, where there is a motion, argument, or offer of proof or evidence in the absence of the jury, whether during trial or before, pertaining to an issue that later arises in the presence of the jury, and counsel has fully complied with the requirements for preserving his objection or exception to the judge's adverse ruling thereon in the absence of the jury, the matter shall be deemed to be distinctly raised at the trial for purposes of this rule without a further objection or exception provided that the grounds for such objection or exception, and the ruling thereon as previously articulated, remain the same."

## V

The defendant next claims that the trial court erred in excluding the results of the defendant's polygraph examination. He acknowledges, as he must, that this court consistently has held polygraph evidence to be inadmissible. *State* v. *Saia,* 172 Conn. 37, 42, 372 A.2d 144 (1976); *State* v. *Mitchell,* 169 Conn. 161, 169, 362 A.2d 808 (1975); *Molino* v. *Board of Public Safety,* 154 Conn. 368, 376–77, 225 A.2d 805 (1966). He argues, however, that prior decisions of this court that address the admissibility of polygraph evidence left open the possibility for a "re-evaluation" or "alteration" of this rule in an appropriate case; *State* v. *Saia,* supra; *State* v. *Mitchell,* supra; and that this is such a case. We disagree.

We recently noted in *Moore* v. *McNamara,* 201 Conn. 16, 30, 513 A.2d 660 (1986), a case which involved the admissibility of human leucocyte antigen test (HLA) results to establish paternity, that "[t]he prevailing standard for judicial recognition of the probative value of scientific evidence has been carefully delineated in *Frye* v. *United States,* 293 F. 1013 (D.C. App. 1923): 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.' Id., 1014. This court has used the *Frye* standard in appraising the admissibility of evidence derived from innovative scientific techniques. See, e.g., *State* v. *Tomanelli,* 153 Conn. 365, 370, 216 A.2d 625 (1966) ('general scientific acceptance of the

Doppler-shift principle upon which police radar operates'); cf. *Molino* v. *Board of Public Safety,* [supra, 376] ('unreliability of the polygraph test has resulted in its universal rejection')."

Despite this recent statement by this court, the defendant argues that the modern trend is away from the *Frye* test toward a "substantial acceptance" test, which would permit the trial judge to exercise discretion in admitting polygraph evidence. While it is true that a number of jurisdictions, both federal and state, permit such discretion in admitting polygraph results pursuant to a stipulation; see, e.g., *Brown* v. *Darcy,* 783 F.2d 1389, 1394 (9th Cir. 1986); *United States* v. *Black,* 684 F.2d 481, 482–84 (7th Cir.), cert. denied, 459 U.S. 1043, 103 S. Ct. 463, 74 L. Ed. 2d 613 (1982); *United States* v. *Alexander,* 526 F.2d 161, 170 (8th Cir. 1975); *State* v. *Bullock,* 262 Ark. 394, 397, 557 S.W.2d 193 (1977); the defendant concedes that only a small number of jurisdictions have permitted such discretion in the absence of a stipulation between the parties. See, e.g., *United States* v. *Webster,* 639 F.2d 174, 186 (4th Cir. 1981); *United States* v. *Glover,* 596 F.2d 857, 867 (9th Cir.), cert. denied, 444 U.S. 860, 100 S. Ct. 124, 62 L. Ed. 2d 81 (1979); *State* v. *Dorsey,* 88 N.M. 184, 185, 539 P.2d 204 (1975); cf. *Commonwealth* v. *Vitello,* 376 Mass. 426, 427–57, 381 N.E.2d 582 (1978). The traditional rule, as the state points out, however, is that polygraph results are per se inadmissible when offered by either party, either as to substantive evidence or as related to the credibility of the witness. See, e.g., *United States* v. *Hilton,* 772 F.2d 783, 785 (11th Cir. 1985); *United States* v. *Nelson,* 606 F. Sup. 1378, 1384–85 (S.D.N.Y. 1985); *Pulakis* v. *State,* 476 P.2d 474, 479 (Alaska 1970); *People* v. *Anderson,* 637 P.2d 354, 358 (Colo. 1981); *Guesfeird* v. *State,* 300 Md. 653, 658, 480 A.2d 800 (1984); *Commonwealth* v. *Rodriguez,* 343 Pa. Super. 486, 495, 495 A.2d 569 (1985); *Sabag*

v. *Continental South Dakota,* 374 N.W.2d 349, 352 (S.D. 1985); *State* v. *Dean,* 103 Wis. 2d 228, 263–80, 307 N.W.2d 628 (1981); see C. McCormick, Evidence (3d Ed.) § 206, pp. 628–29 n.44.

"The questionable accuracy of polygraph examinations is the most persuasive reason for excluding polygraph evidence." *Brown* v. *Darcy,* supra, 1395; see generally C. McCormick, supra, § 206, pp. 626–27. The overall reliability of such evidence is still widely debated; C. McCormick, supra; and we see no reason to depart from the rule first announced in *Molino* v. *Board of Public Safety,* supra, that polygraph evidence is inadmissible.

## VI

The defendant next claims that the evidence was insufficient to establish beyond a reasonable doubt that he committed the crimes charged. He contends, therefore, that the trial court erred when it denied his motion to dismiss at the end of the state's case, and when it denied his motion for a judgment of acquittal notwithstanding the verdict.

"When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980). In reviewing the sufficiency of the evidence supporting a jury verdict, this court must construe that evidence in the most favorable manner reasonably possible to support the jury verdict. *State* v. *Rodriquez,* 200 Conn. 685, 688, 513 A.2d 71 (1986). "The relevant question in our review ' " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)].' (Emphasis in original.) *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)." *State* v. *Morrill,* 197 Conn. 507, 512, 498 A.2d 76 (1985).' *State* v. *Brown,* 199 Conn. 14, 23, 505 A.2d 690 (1986)." *State* v. *Rodriquez,* supra.

In this case, the eyewitness' identification of the defendant as the assailant, if believed by the jury, was sufficient to support the jury's verdict. In addition to her testimony, however, the jury could reasonably have found that the following circumstantial evidence linked the defendant to the crimes. The handcuffs used were of a brand name supplied to federal correctional institutions, and the defendant in August, 1981, was employed at the federal correctional institution in Danbury, and had formerly been employed at the federal correctional institution in Atlanta, Georgia. The handcuffs were placed on William's wrists very quickly by an assailant who used only one hand to accomplish the task, and the defendant was very familiar with the use of handcuffs. The defendant reported for work the night of the assault with abrasions across his knuckles and on the back of his hands, and with scratch marks on his arms, neck and face. The assailant initially identified himself as a policeman, the type of occupation in which the defendant was employed from 1968 to 1973. Also, an anonymous telephone call was placed the night of the crimes to the New York state police substation in Brewster, New York, by a man who said he had just killed two people behind the church on Clapboard Ridge Road in Danbury. The Brewster state police substation serves Patterson, New York, where the defendant resided. Further, on the occasion when Elizabeth recognized the defendant in Bradlees it appeared as though

he was attempting to avoid being seen. Finally, the defendant admitted being familiar with the area where the assaults had occurred.

In view of the eyewitness identification and the circumstantial evidence adduced at the trial, we cannot say that the jury could not reasonably have concluded that the cumulative effect of the evidence was sufficient to prove beyond a reasonable doubt that the defendant was the perpetrator of the assaults in question. See *State* v. *Rodriquez,* supra, 692–93.

The defendant also claims that the state failed to prove beyond a reasonable doubt that the injuries suffered by William in the assault constituted "serious physical injury." The state was required to prove William sustained "serious physical injury" in order to obtain a conviction of assault in the first degree on the second count of the information. See General Statutes § 53a-59 (a) (1). "Serious physical injury" is defined in General Statutes § 53a-3 (4) as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."

There was evidence before the jury that William had been strangled until he lost consciousness, that he was bloody and delirious, and that he had severe lacerations on his face. A physician, who had examined William in the emergency room, testified that William had mulitiple abrasions and contusions, that his face and neck were suffused purple, that the area around his eyes was swollen, and that "the white part around his eye was totally red, filled with blood." In addition, he suffered a laceration of the soft palate, which required surgical repair. William spent a week at Danbury Hospital as a result of his injuries. Further, a plastic

surgeon testified that, in his opinion, the injuries to William could cause serious disfigurement and serious impairment of health.

Whether William suffered a "serious physical injury" was a question of fact for the jury. *State* v. *Rossier,* 175 Conn. 204, 207, 397 A.2d 110 (1978); *State* v. *Jeustiniano,* 172 Conn. 275, 281, 374 A.2d 209 (1977); *State* v. *McCulley,* 5 Conn. App. 612, 615, 501 A.2d 392 (1985). In reviewing the sufficiency of the evidence concerning this element of assault in the first degree, our task is to construe the evidence in the light most favorable to sustaining the jury's verdict, and then to determine whether any rational trier of fact could have found that the harm suffered rose to the level of a "serious physical injury" under the statute. *State* v. *Rossier,* supra; *State* v. *Jeustiniano,* supra, 281–82; *State* v. *McCulley,* supra. We cannot substitute our judgment for that of the jury. *State* v. *Rodriquez,* supra, 693. Despite the difficulty of drawing a precise line as to where "physical injury" leaves off and "serious physical injury" begins, in light of the evidence concerning the extent of William's injuries, we cannot say as a matter of law that the jury could not reasonably have found that he suffered "serious physical injury." *State* v. *Rossier,* supra; *State* v. *Jeustiniano,* supra, 282; *State* v. *McCulley,* supra.

## VII

Finally, the defendant claims that the trial court's instructions concerning circumstantial evidence "impermissibly diminished or diluted the requisite constitutional standard of proof of guilt beyond a reasonable doubt." Initially, we note that ordinarily the defendant's failure to except to this portion of the court's charge would preclude review. Practice Book §§ 854, 4185 (formerly § 3063). We will review his claim, however, because it implicates the fundamental constitutional right that the state prove the guilt of an accused

beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Whelan,* 200 Conn. 743, 755–56, 513 A.2d 86, cert. denied, 479 U.S.    , 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

The trial court instructed the jury that it could draw inferences provided: "First, that the fact from which you are asked to draw the inference has itself been proven beyond a reasonable [doubt], and secondly, that the inference asked to be drawn is not only logical and reasonable but is strong enough so that you can find that it is more probable than not that the fact to be inferred is true."[7] This instruction is virtually identical to the jury instruction which resulted in reversible error in two cases recently decided by this court. *State* v. *Whelan,* supra, 755–58; *State* v. *Rodgers,* 198 Conn. 53, 56–59, 502 A.2d 360 (1985). In both *Rodgers* and *Whelan,* however, the disputed and decisive issue at trial was intent, an element of the crimes charged, and an element characteristically proven by circumstantial evidence. *State* v. *Chace,* 199 Conn. 102, 105, 505 A.2d 712 (1986); *State* v. *Farrar,* 7 Conn. App. 149, 155, 508

---

[7] "Now, proof beyond a reasonable doubt does not mean that you have to have direct evidence supporting a fact, you may apply the rule of circumstantial evidence. This rule involves the offering of evidence of facts from which you are asked to infer the existence of another fact or set of facts. Such an inference may be made provided two elements in the application of this rule are satisfied. First, that the fact from which you are asked to draw the inference has itself been proven beyond a reasonable [doubt], and secondly, that the inference asked to be drawn is not only logical and reasonable but is strong enough so that you can find that it is more probable than not that the fact to be inferred is true.

"It is your right to draw inferences if you conclude that the facts you find proven reasonably establish other facts by reason and logic and are not the result of speculation, surmise or guesswork. If from the facts you find proven you reasonably do infer other facts you may then use the fact so inferred as a basis for a further inference that other facts exist, including facts going to establish the guilt or innocence of Mr. Miller."

A.2d 49, cert. denied, 200 Conn. 805, 512 A.2d 229 (1986). This court concluded that the jury, having been told that an inference may be drawn when "it is more probable than not that the fact to be inferred is true," was permitted to draw an inference of intent, the ultimate fact in issue, and an element of the crime charged, by the erroneous probability standard. *State* v. *Whelan,* supra, 758.

In this case, on the other hand, as in *State* v. *Reddick,* 197 Conn. 115, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986), and *State* v. *Farrar,* supra, where similar instructions did not result in reversal, the only real question at trial was the identity of the perpetrator of the crimes charged. The state's case, while bolstered by circumstantial evidence, was based primarily on the eyewitness identification of the defendant as the assailant by one of the victims of the assault. Identity, not intent, was the disputed issue in the case. *State* v. *Reddick,* supra, 133. The trial court's instructions must be read with reference to the factual issues in the case. *State* v. *Farrar,* supra.

On the issue of identity the court instructed the jury: "I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged in each count." The trial court also charged several times that the defendant was presumed innocent and it was the state's burden to prove all the elements of the crimes charged beyond a reasonable doubt.

Reading the trial court's instructions as a whole, it is not reasonably possible that the jury was misled to believe that they were to apply any standard other than that of "beyond a reasonable doubt" in determining

492

the guilt of the accused. *State* v. *Reddick,* supra, 132. Any error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967); *State* v. *Smith,* 201 Conn. 659, 674, 519 A.2d 26 (1986).

There is no error.

In this opinion the other justices concurred.