[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S AUGUST 8, 2002 MOTION FOR CHANGE OF VENUE
 I. Procedural Background.
In this case, the defendant, Alex Sostre, is accused of various crimes, including capital felony, felony murder and murder, in connection with the allegation that he shot and killed Brian Aselton, an East Hartford police officer, on January 23, 1999. The State is seeking the death penalty. Jury selection is scheduled to begin on October 15, 2002. The facts underlying the case are set out in detail in the Supreme Court's decision in State v. Sostre, 261 Conn. 111 (July 30, 2002), and will not be repeated here. Pursuant to an August 8, 2002 Motion for Change of Venue, the defendant has asked the Court to order that this case be transferred to a court location other than the Judicial District of Hartford. The State opposes this motion. In relevant part, the defendant's motion states as follows:
 3. Since the date of the alleged offenses, these matters have been the subject of intense and pervasive media coverage.
 4. Said coverage has included, inter alia, items concerning the police investigation and subsequent arrest of the defendant, the personal characteristics of the victim and the effect of his death on family and friends, and the alleged involvement of the defendant in crimes unrelated to the case.
 5. Said news coverage has continued and will continue in nature and intensity until and including the trial of this case.
6. The result of the foregoing is the creation of a substantial likelihood that the defendant will be CT Page 13679 denied his constitutionally guaranteed right to a fair trial within the Judicial District of Hartford.
An evidentiary hearing was held beginning on September 23, 2002, and oral argument was held on September 30, 2002, in connection with the motion. During the hearing, the defendant introduced evidence of newspaper coverage of the events surrounding the crimes charged; tapes of television coverage of events concerning the crimes and transcripts of the coverage; copies of articles appearing on web sites relating to the case; and testimony by Christopher B. Barnes, associate director of the Center for Survey Research and Analysis at the University of Connecticut. The State did not present evidence.
The Court has reviewed the full record of the hearing, and concludes that the motion should be denied, without prejudice, for the reasons stated below.
 II. Governing Legal Principles.
The defendant claims that his fight to a fair trial will be undermined because of the substantial publicity that the case has generated. He asserts that it will be impossible to select jurors untainted by this publicity. He contends that during the trial, the continuation of intense media coverage will result in unfairness to him. The defendant argues that he could receive a fairer trial in New Haven where, he contends, fewer jurors are likely to have reached a conclusion about his involvement in the offense and his guilt.
It is fundamental that the defendant is entitled to a fair trial before a fair jury that has not been tainted by adverse pretrial publicity. See, e.g., State v. Crafts. 226 Conn. 237 (1993).
But the community also has an interest in observing the judicial system work through open trials. "The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." Press-Enterprise Co. v. Superior Court. 478 U.S. 1,7 (1986).
Practice Book Section 41-23, "Transfer of prosecution; grounds;" attempts to accommodate the interests of the community and the defendant. It states as follows:
Upon motion of the prosecuting authority or the defendant, or upon its own motion, the judicial authority may order that any pending matter be CT Page 13680 transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending (2) If the defendant and the prosecuting authority consent; or (3) Where the joint trial of information is ordered pursuant to Section 41-19 and the cases are pending in different judicial districts or geographical areas. (Emphasis added.)
In a decision in another Hartford case, State v. Walker,2000 Ct. Sup. 8625 (July 12, 2000), Judge Julia E. Dewey summarized the law relating to motions for changes of venue. She stated:
 In balancing the rights of the defendant and the surrounding community, the court is guided by Practice Book Section 41-23 which provides: "Upon motion of the prosecuting authority or the defendant, or upon his own motion, the judicial authority may order that any pending criminal matter be transferred to any other court location: (1) If the judicial authority is satisfied that a fair and impartial trial cannot be had where the case is pending, or (2) If the defendant and the prosecuting authority agree. The defendant bears the burden of showing that he could not otherwise receive a fair and impartial trial." State v. Townsend, 211 Conn. 215, 224, 558 A.2d 699 (1989). When extensive publicity surrounds a criminal trial, a defendant's right to an impartial jury can be affected in two ways: (1) where the pretrial publicity has so saturated the community that prejudice is presumed; and (2) when the accused can demonstrate actual prejudice in the jury panel.
In assessing "presumed prejudice" the inquiry is whether the conviction was "obtained in a trial atmosphere that had been utterly corrupted by press coverage" or the proceedings were "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." Murphy v. Florida, 421 U.S. 794, 786, 799 (1975). Among the factors considered are: the size of the relevant community; the time between the crime and the trial; whether the past crimes of the defendant had been saturated throughout the community; the amount of CT Page 13681 media coverage and whether their treatment of the case is either factual or inflammatory; whether the press was allowed to make a "circus" out of the trial. Murphy v. Florida, supra, 421 U.S. 797-801; State v. Crafts, 226 Conn. 237, 257, 627 A.2d 977 (1993).
 The necessary predicate for a finding of presumptive prejudice is exemplified by Rideau v. Louisiana, 373 U.S. 723, 726 (1963), Estes v. Texas, 381 U.S. 532, 551 (1965), and Sheppard v. Maxwell, 384 U.S. 333, 363
(1966). In Rideau, prejudice was presumed when the defendant's twenty-minute confession was televised three times in a community of 150, 000. In Estes, the courtroom was overrun by the press; television cameras were permitted within the bar, the pretrial proceedings were televised and viewed by some jurors. In Sheppard, the trial was infected not only by a background of extremely inflammatory publicity, but "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants, especially [the defendant]." Sheppard. supra, 384 U.S. 355.
 On the other hand, in determining whether actual prejudice invaded the jury box, the relevant inquiry focuses on the partiality of an individual juror. if the voir dire examination of prospective jurors is thorough and extensive, and defense counsel are permitted fully to explore the level and effects of each prospective juror's exposure to publicity concerning the defendant, then actual prejudice cannot be presumed. See State v. Marra, 195 Conn. 421, 431-33, 489 A.2d 350 (1985). See also State v. Miller, 202 Conn. 463, 480, 522 A.2d 249 (1987).
To the extent that individuals might exhibit some knowledge of the case, it is clear "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." State v. Marra, supra, 195 Conn. 433, quoting Murphy v. Florida, supra, 421 U.S. 800-01. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irwin v. Dowd, 366 U.S. 717, 723 (1961). There is nothing inherently suspect about a juror's testimony that he can judge a CT Page 13682 case fairly and impartially. Smith v. Phillips, 455 U.S. 209 n. 7 (1982).
 III. Examination of the Evidence Presented.
Generally speaking, the evidence presented falls into 3 different groups. It included coverage by the print media; on television; and survey results. The following discussion does not attempt to provide a full description of evidence produced at the hearing, but only a summary.
A. Print Media Coverage: A wide variety of newspaper articles, including articles in The Hartford Courant, The New Britain Herald, The Journal Inquirer, and other newspapers, were introduced into evidence. Printouts of website articles discussing the case were also introduced into evidence. This evidence has been thoroughly reviewed. In summary, it includes extensive reporting on the crimes itself; the investigation, the arrests of the defendants; the guilty pleas of three of the defendants; the funeral of Officer Aselton; and activities undertaken by family and friends to honor Officer Aselton and keep his memory alive.
B. Radio and Television Coverage: The Court viewed tapes and reviewed transcripts of television coverage of the crime and of the investigation, the arrests of this and other defendants, and Officer Aselton's funeral. The coverage included substantial commentary by concerned citizens; by public officials, including the East Hartford chief of police and the Chief State's Attorney; and comments by the Governor at the time of Alex Sostre's arrest. Coverage indicated that the defendant had made a signed, sworn statement. In the coverage, particularly in the early stages when he was arrested, defendant was referred to as a "convicted felon" with violent propensities, and it was stated that Officer Aselton had been "ambushed." Stories reported that co-defendants had decided to cooperate with authorities against Alex Sostre. Numerous stories about activities undertaken by Officer Aselton's family, to honor Brian Aselton and assure that he will be remembered, were reviewed.
C. Survey Results:
Christopher Barnes testified about the survey he had conducted. His written report was admitted as Defense Exhibit 0. The purpose of the survey, the report indicates, was "to determine levels of awareness and knowledge regarding the case of Alex Sostre." A total of 402 telephone interviews were conducted in the Hartford Judicial District and 401 in the New Haven Judicial District. The sample error associated with the CT Page 13683 survey was stated to be plus or minus 5 percent.
Mr. Barnes concluded, as stated in the report, that "There are clear, statistically significant differences in awareness of the Sostre case between the Hartford and New Haven Judicial Districts."
For example, he testified that the survey results indicated that 74 percent of Hartford respondents "reported having heard or read about the January 1999 incident in which an East Hartford police officer was killed compared to 45 percent of New Haven respondents." While this differential may be statistically significant, it is not legally significant in and of itself, because "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." Murphy v. Florida. 421 U.S. 794, 799-800
(1975). See also Patton v. Yount, 467 U.S. 1025, 1035 (1984) ("The relevant question is not whether the community remembered the case, but whether the jurors at Yount's trial had such fixed opinions that they could not judge impartially the guilt of the defendant.") To cite another example, a total 41 percent of the Hartford respondents indicated that they thought Alex Sostre was "almost certainly guilty" (16 percent) or "probably guilty" (25 percent), while only 7 percent of New Haven respondents indicated they though Sostre was "almost certainly guilty" and only 17 percent of New Haven respondents thought he was "probably guilty," for a total of only 24 percent concluding he was either "almost certainly guilty" or "probably guilty." While the difference was described by Mr. Barnes as "statistically significant," it is not enormous.
At the same time, the survey results suggest, based on the sample, that there are large numbers of people in the Hartford area with only limited, or fragmentary, knowledge and opinions about the case. Only 10 percent of the Hartford respondents indicated they had ever heard of a person named Alex Sostre (Question 1); 43 percent of Hartford respondents indicated they didn't have knowledge about Alex Sostre (Question 2); and only 13 percent of Hartford respondents indicated they had paid "a lot of attention" to news reports about the case (Question 8). Fifty-nine percent of respondents said it would be "very easy" or "somewhat easy" to put aside anything they knew or had been told about the case and deal just with the evidence presented at trial (Question 21.)
As Judge Dewey noted in her Walker decision:
It is a major premise of a statistical case that the data base statistically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy." CT Page 13684 McClesky v. Kemp, 481 U.S. 279, 288 n. 6 (1987), citing McClesky v. Kemp. 580 F. Sup. 338, 353
(ND Ga. 1984). In the present case, the individuals who volunteered to participate in the telephone surveys were no substitute for actual venire persons. . . . These 400 individuals were asked brief, sometimes suggestive, questions and were allowed to respond, or not, as they desired. In contrast, venire persons, in court as a result of a court order, are placed under oath and screened through an extensive, compulsory voir dire proceeding. No survey can hope to approach the actual process of jury duty with its attendant responsibility and seriousness.
Some of Judge Dewey's comments and concerns are applicable in this case as well. But even putting aside these concerns, defendant's evidence falls well short of persuading the Court that a fair and impartial trial cannot be held in Hartford. The survey results can fairly be read to indicate that the level of knowledge of the case is substantially higher in Hartford, as opposed to New Haven. The survey results also suggest that a higher percentage of people have formed preliminary opinions as to the guilt or innocence of defendant.
 IV. Application of Facts to Current Law
The decisions in Murphy and Crafts provide a template for the Court in ruling on the pending motion.
1. The Size of the Relevant Community. In this case, the relevant community is the Hartford Judicial District, including surrounding towns and rural areas. It is not an isolated community, a small town, or a discrete geographical area, which distinguishes it, for example, from State v. Duntz, CR 88-62645, a Litchfield County case relied upon by defendants. Unfortunately, the Hartford community is exposed to frequent reports of crimes of a notorious nature.
2. The Time Between the Crime and the Trial. Close to four years have elapsed since the time of the murder. Press coverage was intense and ongoing in the days and weeks after the crime. Then, it lessened and tapered off, with coverage becoming episodic. With trial approaching, the case is again in the news, and it is predictable that coverage will continue throughout the duration of the trial. All things considered, the frequency and intensity of the coverage has subsided substantially since the crime was committed, lessening the potential effect of publicity on prospective jurors. State v. Crafts, 226 Conn. 237, 259 (". . . the CT Page 13685 passage of an extended period of time from the defendant's arrest . . . to the first trial . . . and finally to the second trial . . . attenuated the prejudicial effect that the publicity might otherwise have had.") Most of the heavy coverage occurred in the immediate aftermath of the murders. State v. Piskorski, 177 Conn. 677, 683 (1979). In the Court's view, the passage of time between the crimes alleged and the trial substantially ameliorates any possible harm caused by the initial burst of publicity. The defendant has indicated concern about the impact that continuing coverage of this case will have on the trial. But in the Court's view, no matter where the trial is held, it will generate steady press coverage given the nature of the case.
3. Whether the Past Crimes of the Defendant Had Been SaturatedThroughout The Community. Some of the coverage makes reference to the defendant's criminal history. Some of the coverage also makes reference to the defendant's prior conviction for larceny in the third degree, a felony, upon which the state relies as an aggravant in this case, and court rulings relating to this prior larceny felony conviction. But the references, for the most part, were factual and not inflammatory.
4. The Amount of Media Coverage and Whether Its Treatment of the CaseIs Either Factual or Inflammatory. Not surprisingly, some of the coverage focused on the human tragedy stemming from a crime such as the murder charged in this case; the tragic feeling of loss suffered by family and friends of Officer Aselton; and steps taken to keep his memory alive and to honor his life. Some of the coverage also focused on the response by the overall community, and the law enforcement community, in particular. While some of the coverage, understandably, had emotional aspects, most of it was factual in nature. Very little could be fairly characterized as inflammatory. As our Supreme Court stated in State v. Piskorski,177 Conn. 677, 688 (1979). prominence is not the equivalent of prejudice. One who has been accused of committing a notorious crime, the Court said, citing Dobbert v. Florida, 432 U.S. 282, 303, "`cannot expect to remain anonymous.'" The coverage does not indicate that anyone has suggested that the defendant is entitled to anything other than a fair trial where a jury can decide the issues with all of the "solemnity and sobriety," Murphy v. Florida 421 U.S. 794, 799 (1975), which is required.
5. Whether the Press Was Allowed to Make a `Circus' Out The Trial.
There is nothing in the evidence to indicate that the press coverage has created the "carnival atmosphere" condemned in Sheppard v. Maxwell,384 U.S. 333 (1966), or an atmosphere "utterly corrupted by press coverage," as condemned in the Murphy case. CT Page 13686
 V. Conclusion
The evidence presented by the defendant in support of its Motion to Change Venue fails to persuade the Court that the trial must be transferred to another judicial district. If potential jurors reveal that they have formed opinions about the case which would prevent them from judging the case fairly based on the facts of the case and the applicable law, they can be identified and weeded out during jury selection. Numerous safeguards exist to ensure that a fair an impartial jury, uninfluenced by press coverage and unencumbered by strong fixed beliefs about defendant's guilt, is selected. These safeguards include the existence of individual voir dire of jurors; challenges for cause; numerous peremptory challenges; Batson challenges; instructions on the law; admonitions to jurors to avoid discussing the case with anyone or allowing themselves to be exposed to publicity about the case; and other procedures. Mechanisms exist to ensure that, during the trial itself, jurors scrupulously avoid exposing themselves to anything that could inappropriately influence their view of the case. Given the nature of the allegations, many of the concerns raised by the defendant would be evident in any jurisdiction in which the trial was held. The Court is convinced that the defendant can be provided the fair and impartial trial to which he is entitled in Hartford. If circumstances change, the defendant will be permitted to renew his motion.
The motion is denied, without prejudice.
___________________ Douglas S. Lavine Judge Superior Court CT Page 13687